[No. 31794.   Department Two.   November 5, 1951.]

IRENE M. POOLE, *Respondent*, v. HERBERT A. SCHRICHTE, *Appellant.*[1]

¹Reported in 236 P. (2d) 1044.

*Dalton & Bibb,* for appellant.

*Warren Hardy* and *Margaret Gaskill,* for respondent.

HILL, J.—The respondent, Irene M. Poole, and the appellant, Herbert A. Schrichte, lived together without the formality of a marriage ceremony, from 1935 to 1941 in Chicago and from 1941 to 1947 in Seattle. The present action is to determine their respective interests in a tavern and certain household furniture and personal property in Mr. Schrichte's possession.

In January, 1942, they combined their limited resources to acquire a beauty shop, which Mrs. Poole operated under

the name of "Crosley Beauty Salon." (Their resources were then so limited that Mrs. Poole had to borrow fifty dollars to help pay the first month's rent.) During 1942, 1943, and part of 1944, Mr. Schrichte worked as a railroad switchman. In his spare time he constructed living quarters in back of the beauty shop, assisted Mrs. Poole in its business management, and did maintenance work in connection with its operation.

She opened a bank account, which will be referred to as the "Crosley account," and into it went the proceeds from the operation of the beauty shop and Mr. Schrichte's earnings, and the funds so deposited were used for their living expenses and for the operation of the shop. Mrs. Poole alone could write checks on this account.

In June, 1944, Mr. Schrichte sustained an injury that marked the termination of his employment with the railroad. In August of that year, they made a three-thousand-dollar payment from the Crosley account on the purchase of a tavern and borrowed ten thousand dollars to pay the balance of the purchase price. The loan was secured by two chattel mortgages, one on the fixtures and equipment in the beauty shop and one on the fixtures and equipment in the tavern. The bill of sale to the tavern, the lease, and the liquor licenses were in Mr. Schrichte's name, as was a bank account that was opened with six hundred dollars from the Crosley account and into which most of the tavern proceeds went. Checks signed "Herbert A. Schrichte, by Mrs. Herbert A. Schrichte" were honored on the tavern account.

For almost two years, until the beauty shop was sold in 1946, she ran the salon while he ran the saloon. Both before and after the sale of the beauty shop, because of Mr. Schrichte's frequent asthmatic seizures, which necessitated trips to Arizona, California, Canada, and eastern Washington for relief, Mrs. Poole devoted considerable time to the tavern's operation and business management.

They purchased a house in January, 1946. The down payment and some of the monthly payments on the mortgage were made from the proceeds of the tavern. When the beauty shop was sold, some $1,534 from the proceeds of the

sale was used to accelerate the payments on the house, and the remainder, like the proceeds from the operation of the shop, was used for living expenses. The Crosley account was closed in September, 1947, the balance in the account, $844, finding its way into the tavern account.

Differences arose between the parties, and they separated October 9, 1947. He testified, "She left me"; her testimony was that he "threw me out bag and baggage. . . . He hit me until I couldn't walk, and I had to go to the hospital." A friend of hers testified that when Mrs. Poole left the hospital, "She was in bad condition. Her mouth was swollen and her face was in a bad mess."

Under those circumstances, the separation justifiably terminated any attempt by Mrs. Poole to participate in the operation of the tavern.

She instituted the present action to establish her interest in the tavern and in the household furniture and personal property which remained in Mr. Schrichte's possession. The trial court gave her a judgment for five thousand dollars against Mr. Schrichte in lieu of a half interest in the tavern and the profits thereof subsequent to her exclusion from any participation in its operation, and also gave her a half interest in the furniture and personal property. He has appealed.

The theory of both parties as to the proper disposition of this case stems from the fact of their cohabitation, concededly meretricious in its inception in Chicago in 1935, as Mrs. Poole had not at that time secured a final divorce from her second husband.

Both parties rely upon rules which we laid down in a recent *En Banc* decision, *Creasman v. Boyle,* 31 Wn. (2d) 345, 196 P. (2d) 835. We there said that property acquired by a man and woman not married to each other but living together as husband and wife, is not community property and, in the absence of some trust relationship, belongs to the one in whose name legal title to the property stands, and we then referred to six cases, to wit: *Stans v. Baitey,* 9 Wash. 115, 37 Pac. 316; *In re Sloan's Estate,* 50 Wash. 86,

96 Pac. 684, 17 L. R. A. (N.S.) 960; *Engstrom v. Peterson,* 107 Wash. 523, 182 Pac. 623; *Beyerle v. Bartsch,* 111 Wash. 287, 190 Pac. 239; *Carr v. Bell,* 129 Wash. 413, 225 Pac. 230; *Hynes v. Hynes,* 28 Wn. (2d) 660, 184 P. (2d) 68. We applied that rule in the *Creasman* case, and upon it Mr. Schrichte, appellant here, relies.

We also said in *Creasman v. Boyle, supra,* that even if there be no lawful marriage between the parties living together as husband and wife,

" . . . yet if either or both of them in good faith enter into a marriage with the other, or with each other, and such marriage proves to be void, a court of equity will protect the rights of the innocent party in the property accumulated by the joint efforts of both";

and cited four cases in support of that rule, to wit: *Buckley v. Buckley,* 50 Wash. 213, 96 Pac. 1079, 126 Am. St. 900; *In re Brenchley's Estate,* 96 Wash. 223, 164 Pac. 913, L. R. A. 1917E, 968; *Knoll v. Knoll,* 104 Wash. 110, 176 Pac. 22, 11 A. L. R. 1391; *Powers v. Powers,* 117 Wash. 248, 200 Pac. 1080. On that rule the respondent, Irene Poole, relies, contending as the basis for her action that she had believed that, when she and Mr. Schrichte had lived together in Illinois for two years after her divorce from her second husband became final, a common-law marriage between them came into existence.

It is our view that, so far as the principal item of controversy is concerned, *i. e.,* the interest of Mrs. Poole in the tavern, it is immaterial whether either of these people believed they were married. Mr. Schrichte terminated their relationship with some measure of violence and then, although Mrs. Poole concededly had a substantial investment in the tavern, he said, in effect: "Title is in my name; our relations were meretricious, and under the rule laid down in *Creasman v. Boyle* the courts won't give you any relief."

Mr. Schrichte misconceives the effect and circumference of the rule applied in *Creasman v. Boyle, supra.* As pointed out in the later case of *Walberg v. Mattson,* 38 Wn. (2d) 808, 232 P. (2d) 827, the result arrived at in *Creasman v. Boyle, supra,* was due to the fact that no evidence of the

actual intent of the parties was introduced, since the woman was dead and, under Rem. Rev. Stat., § 1211 [P.P.C. § 38-3], the man was prohibited from giving such testimony. The significant language in *Creasman v. Boyle, supra,* is:

"We think that, under these circumstances [the parties having lived together with full knowledge that their relationship was meretricious] and *in the absence of any evidence to the contrary,* it should be presumed as a matter of law that the parties intended to dispose of the property exactly as they did dispose of it." (Italics ours.)

To attempt, as Mr. Schrichte does here and as was done by Mrs. Mattson in *Walberg v. Mattson, supra,* to say that we held in *Creasman v. Boyle, supra,* that, if a man and woman had lived together in a relationship known by both of them to be meretricious, the courts will leave them in the position in which they placed themselves, and that it will be *conclusively* presumed that they intended to dispose of their property exactly as they did dispose of it, is to distort our holding in that case and to ignore the words which we have italicized, "in the absence of any evidence to the contrary."

We have on but three occasions actually left the parties to a relationship known by both parties to be meretricious, in the position in which they had placed themselves. *Stans v. Baitey, supra; Engstrom v. Peterson, supra; Creasman v. Boyle, supra.* In each instance one of the parties to the meretricious relationship was dead, which seems to be more than a coincidence and suggests that the difficulty of producing evidence of contrary intent is the reason the court presumed that the parties intended to dispose of their property exactly as they did dispose of it.

*In re Sloan's Estate, supra,* is also generally cited as supporting the rule applied in the *Creasman* case. The woman there involved in the meretricious relationship (if it was) was dead, and the controversy was between the man, who sought to quiet title in his own name, and the woman's children by a prior marriage, who claimed an interest in the property, so the factual pattern may have been the same as in *Stans v. Baitey, supra; Engstrom v. Peterson, supra;* and *Creasman v. Boyle, supra.* We say "may have been" be-

cause the trial court granted a nonsuit at the conclusion of the man's case and the woman's heirs had not put in their evidence. We reversed the trial court and sent the cause back for a new trial, saying that on the state of the record at the time the case was closed it had been *prima facie* established that there was no valid marital relationship between the man and the woman, that they both knew it, and that the burden was on the woman's children to establish a relationship that would give them some interest in the property.

*Hynes v. Hynes, supra,* is likewise usually included in the cases cited as supporting the rule we applied in the *Creasman* case. There both parties were before the court and the real property stood in both names. The man attempted to have title quieted in him. The trial court refused to quiet title and we affirmed, not on the basis of any presumption, as in the *Creasman* case, but on the basis that the evidence established that there had been an express agreement between the parties that whatever property they purchased should be taken in the names of both, and that each was to have an undivided one-half interest therein.

The other two cases cited, *Beyerle v. Bartsch, supra,* and *Carr v. Bell, supra,* have no direct bearing on the question presented.

■ We have here a situation in which, if the parties to this action had not been living together, there would be no question but that Mrs. Poole had at least a one-half interest in the tavern. Her rights do not stem from cohabitation or the meretricious relationship, but from the fact that the proceeds from the beauty shop she operated clearly constituted a larger proportion of the Crosley account than did Mr. Schrichte's earnings as a railroad switchman. The undisputed testimony is that the money that went into the down payment on the tavern was at least half hers; that her credit was pledged to make its purchase possible, and that she assisted in its operation during Mr. Schrichte's frequent illnesses and absences from the city. The other payments on the purchase price came from the operation of the tavern. We know of no rule of law or equity that says that if she

lived with Mr. Schrichte knowing that she was not married to him, she thereby forfeited her interest in the tavern because he had the foresight to see that the legal title thereto stood in his name.

The evidence establishes here a joint venture if not a partnership between the parties so far as their interests in the tavern are concerned. Their social relationships, legal or illegal, moral or immoral, are not material on this phase of the case. Mr. Schrichte chose to exclude Mrs. Poole from any voice in the operation of the tavern, and that she has made no contribution to its operation since October, 1947, is his fault, not hers. We would, therefore, not have allowed him the sum of $1,372 with which the trial court credited him for his services to the joint venture in the operation of the tavern.

Mr. Schrichte urges that, the trial court having found that he was entitled to $39.80 a month for his services in the operation of the tavern and Mrs. Poole not having appealed from that finding, the law of the case is that he is entitled to compensation for his services to the joint venture; and that it is obvious that $39.80 a month is an arbitrary and not an adequate allowance, and, since he is entitled to compensation, the case should be remanded for the taking of evidence as to the value of his services. The argument is that we should not only perpetuate what we conceive to be error in allowing Mr. Schrichte any compensation for his services, but we should remand the case so that the error might be augmented.

In an equity case, the trial is *de novo* in this court, and, although the trial court's findings are given great weight, we do, so far as necessary, make our own findings and draw our own conclusions, and certainly we are not bound to perpetuate error. *Akers v. Sinclair*, 37 Wn. (2d) 693, 226 P. (2d) 225.

We fail to see how the trial court could have found Mrs. Poole's interest in the business and her share of the proceeds to be less than five thousand dollars. She seemingly is satisfied with that amount, or at least does not cross-

appeal from the judgment awarding it to her. That portion of the trial court's judgment will therefore be affirmed.

█ It could likewise be affirmed on the theory adopted by Mrs. Poole and the trial court, *i.e.*, that she had actually believed that there was a common-law marriage and that in such a situation, although she was mistaken, a court of equity will protect the rights of the innocent party in the property accumulated by the joint efforts of both. While some skeptics might be dubious as to the good faith of Mrs. Poole, since there is no common-law marriage in either Illinois or Washington, the experienced trial judge was convinced that she believed she was married, and he so found; and he, though doubtless gallant, is not entirely naive and unacquainted with the ways of the world. After an examination of the record, we are agreed that there is credible evidence to support that finding and to establish that Mrs. Poole is an innocent party within the rule, and that under such circumstances a court of equity will protect the rights of an innocent party in the property accumulated by the joint efforts of both.

We have not been too clear or too explicit as to the standards to be applied in the division of the property in such a case. In the first of such cases, *Buckley v. Buckley*, 50 Wash. 213, 96 Pac. 1079, Andrew Buckley was being sued by his divorced wife (divorce secured in Illinois with no disposition of property rights) for a division of the community property, and simultaneously by a woman who had believed herself to be his wife, asking for a divorce or annulment and a division of the accumulated property, the total value being between five and six thousand dollars. The trial court awarded each of the women one quarter of the property and Mr. Buckley one half. We said:

"Bearing in mind that appellant Buckley accumulated this property, and that he is now sixty-six years old, in feeble health, requiring support, medical attendance, and nursing, we cannot say that the disposition of the property, as made by the trial court, was erroneous, inequitable, or unjust."

In that case, the right of the court to make division of the property accumulated while the parties were illegally living together· was placed upon the authority given by the divorce statute, this court taking the position that the trial court had jurisdiction as between the parties to dispose of their property as it would in case of a divorce. Judge Rudkin concurred in the result achieved as being just and equitable, but urged that the divorce statute had no applicability.

In *Sortore v. Sortore*, 70 Wash. 410, 126 Pac. 915, the parties to a void marriage had lived together in good faith for eight years. The trial court awarded the only real property to the woman, it having been her separate property prior to the void marriage. The man contended that he had made substantial improvements to the property, but the court found that the improvements added little to the value of the property. We affirmed the trial court, saying that "justice has been done."

The next case was *In re Brenchley's Estate*, 96 Wash. 223, 164 Pac. 913. Brenchley and the respondent there were married and lived together for twenty-six years. The marriage, however, occurred before his divorce became final, although both parties acted in entire good faith. At Brenchley's death, all the property, real and personal, in the total value of sixty-four hundred dollars, stood in his name, and an action was brought by his son by a former marriage claiming it. The trial court awarded the respondent one half of the property, and we affirmed, saying:

"The record shows that the respondent kept boarders, kept a lodging house, was a nurse and midwife, and contributed her earnings to the payment of the obligations which purchased the property. Under these facts, it is clear that she is at least entitled to one-half of the property, which the court awarded her, notwithstanding the fact that the marriage was void."

We there quoted a Texas court (*Lawson v. Lawson*, 30 Tex. Civ. App. 43, 69 S. W. 246) as saying:

" 'In *Morgan v. Morgan*, 1 Texas Civil Appeals, 315, Justice Head, in his discussion of the principles under which the putative wife acting in good faith might have her just

rights secured to her, entered into a thorough review of the authorities and held that the tendency of our courts, as evidenced by the decisions involving kindred questions, justified the conclusion that she should be treated as a partner as to all property shown to have been acquired by their joint efforts' ";

and then said, "That is the just rule, and is the one applied by the lower court."

Next came *Knoll v. Knoll*, 104 Wash. 110, 176 Pac. 22. This started as a divorce action, but when the evidence established that there had been no legal marriage although both parties had acted in good faith, the trial court granted an annulment and refused to pass on the property rights. We sent the case back with instructions to dispose of the property rights. We there laid down the rule that

". . . good faith, whether resting in mistake of fact or mistake of law, is enough to authorize the courts, in an action brought for the annulment of the marriage, to treat the relation as a partnership as to all property acquired by the joint efforts of the parties."

In *Powers v. Powers*, 117 Wash. 248, 200 Pac. 1080, decided in 1921, only the woman was acting in good faith. The parties had lived together from 1900 to 1919. In 1917 they came to the state of Washington from Idaho after selling their properties in that state, and acquired real property in Asotin county, in the man's name. He took the money left from the sale of the Idaho properties and went back to Minnesota to live with his wife, from whom he had never been divorced. The woman was granted an annulment and the real property in Asotin county. There is no discussion, in the opinion, as to the value of that property as compared to the amount of money that the man took with him to Minnesota. We there said:

"Under the facts, the court had the power in the action to annul the void marriage and to award to the respondent such portion of the property as she was equitably and justly entitled to."

In the recent case of *Valentine v. Valentine*, 31 Wn. (2d) 650, 198 P. (2d) 494, where the parties had lived together

less than two months, no property had been accumulated, but the man, who had acted in good faith, was allowed to recover some thirty-five hundred dollars on an accounting.

When we referred to this line of cases in *Creasman v. Boyle, supra,* we said that a court of equity "will protect the rights of the innocent party in the property accumulated by the joint efforts of both."

■ This is not an action for an annulment under the Laws of 1949, chapter 215; and § 11 thereof (Rem. Supp. 1949, § 997-11) has no application to a division of the property in this case. We agree with Judge Rudkin in his concurring opinion in *Buckley v. Buckley, supra,* that the authority and jurisdiction of the court to divide the property accumulated during such a relationship is in consequence of the court's inherent equity power, and not because of the divorce statute. It is likewise our view that the court is not limited, under an equal partnership concept, to an even division of the property accumulated, but that the innocent party may be awarded such proportion of the property accumulated as would under all the circumstances be just and equitable.

■ We are of the opinion that the interest in the tavern and its profits to which Mrs. Poole is entitled is not less than the five thousand dollars allowed by the trial court, and that the judgment in that amount in her favor meets the standard of a just and equitable division of the tavern property under the existing circumstances.

■ With reference to the furnishings and personal property, the accumulation of which was inextricably connected with the fact that the parties lived together as husband and wife, we hold, with the trial court, that respondent can recover on the "innocent party" theory. The trial court found

" . . . that the list of furniture and personal property shown in the various exhibits on file in this case is the common property of the plaintiff [respondent] and defendant [appellant] herein and that the same should be divided one-half to plaintiff and one-half to defendant."

■ The appellant insists that there was an accord and satisfaction with reference to the household furniture and personal property, based upon appellant's statement to respondent, when she went to the house with a van to remove certain articles of household furniture, that she could and should take everything she wanted. This was an empty gesture in the absence of agreement by respondent that she would at that time remove everything she wanted. There is absolutely no evidence of any such agreement; in fact, Mr. Schrichte testified that she did not then remove many of the articles in which she now claims an interest because

" . . . she was afraid to take a lot of these things over there to this boarding house, I guess, because she figured, I guess, they would be stolen over there."

The event which was the basis of Mr. Schrichte's claim of an accord and satisfaction occurred in November or December, 1947, and in June, 1948, the parties agreed upon an amount to be paid Mrs. Poole for one half of the value of their dishes and silverware, which certainly is not consistent with his claim of an earlier accord and satisfaction. We find no merit whatsoever in that claim.

The judgment is affirmed in its entirety.

HAMLEY, FINLEY, WEAVER, and OLSON, JJ., concur.